**497**

UNITED STATES of America, Plaintiff,

v.

ARTICLES OF FOOD AND DRUG et al., Defendants.

Civ. A. No. 77–C–285.

United States District Court,
E. D. Wisconsin.

April 25, 1978.

See also, D.C., 441 F.Supp. 772.

William J. Mulligan, U. S. Atty. by Stephen E. Kravit, Asst. U. S. Atty., Milwaukee, Wis., for plaintiff.

Joseph W. Weigel, Milwaukee, Wis., and Kirkpatrick W. Dilling, Chicago, Ill., for defendants.

## DECISION AND ORDER

REYNOLDS, Chief Judge.

On Tuesday, April 4, 1978, through Thursday, April 6, 1978, on motion of the plaintiff United States of America, a hearing was held on an order to show cause why the defendants Mosinee Research Corp., U. S. Pharmaceuticals, Inc. ("U.S.P.I."), Albert C. Iwen, Douglas R. Evers, John M. Couture d/b/a Product Distributors Co., Joseph J. Birkenstock, and Ralph D. Pennings should not be held in civil contempt of court for alleged violations of the injunction issued in this action on July 29, 1977, D.C., 441 F.Supp. 772, and in particular as to paragraphs 4 and 5 thereof.

Paragraphs 4 and 5 of said decree of injunction provide:

"4. Within thirty (30) days from entry of this injunction the defendants shall submit to the Honorable John W. Reynolds, Chief United States District Judge for the Eastern District of Wisconsin, an affidavit listing all distributors within defendants' knowledge of amygdalin produced or distributed by defendants. Said affidavit shall also list all places where defendants have knowledge that any of their amygdalin or any component thereof is stored or held.

"5. All existing amygdalin and amygdalin components now held by defendants is held for sale in violation of the Federal Food, Drug and Cosmetic Act, and shall be forfeited forthwith to the United States in the custody of the United States Marshal. Defendants shall cooperate with the Marshal and shall forthwith turn over to him all articles of food or drug containing amygdalin now in their possession or control. This relief is granted in accordance with the Court's inherent equity powers, and is intended to expeditiously remove all articles of food and drug containing amygdalin in

the defendants' possession or control from interstate commerce. To enforce the terms of this decree, should defendants or their officers, agents, servants, employees and representatives, and any and all persons in concert and/or participation with them, or any of them, fail to cooperate with the Marshal in carrying out the terms of this order once they have notice of its contents, a Warrant Seizure & Monition is hereby authorized and issued for July 29, 1977, for 1423 Marshall Street in Manitowoc, Wisconsin, (the manufacturing plant of U. S. Pharmaceuticals, Inc.) and 13131 Janesville Road, Hales Corners, Wisconsin, (premises owned by John Couture and offices of Product Distributors Company). Upon application to this Court, further warrants of seizure and monition will be issued for other locations as required to carry out the terms of this injunction order."

The defendants admit that they have not submitted an affidavit listing all distributors within their knowledge or all places within their knowledge where their amygdalin or any component thereof is stored as required by paragraph 4.

The five named defendants were present at the hearing on the order to show cause, and all of them testified at the hearing. In addition, the Government introduced evidence of an application by the defendant Pennings, prepared by the defendant Couture, for a trademark for a product called "Rectalin–17," which is stated on the face of the application to contain amygdalin for use in interstate commerce. (See Exhibits 4, 5, 6, and 15.) The Government also introduced evidence obtained during a search conducted at the U.S.P.I. plant located at 1423 Marshall Street in Manitowoc, Wisconsin, on February 10, 1978. However, this evidence was thereafter suppressed on motion of the defendants and will not be considered by the Court in this decision and order, nor will testimony of the defendants be considered which the Court believes would not have been obtained absent the introduction of the subsequently suppressed evidence.

In relevant part, the defendant Couture testified that he has been the general counsel for U.S.P.I., a stockholder, and a director since its inception in February 1975; that U.S.P.I. did not have a list of regular distributors, but instead sent advertising fliers to health food stores listed in the yellow pages of the telephone book; that he did maintain files of customer correspondence from which a list might have been derived, but that those files disappeared from his office during the search by Food and Drug Administration ("FDA") inspectors, conducted in July 1977 while he was out of the country. He also testified that since the Court's order of July 29, 1977, he has made two or three sales of Rectalin–17, which contains amygdalin, which he obtained from the defendant Pennings in lots of approximately twenty vials each, to individuals in Wisconsin. Couture further stated that he has discussed with Pennings starting up a business for the sale of Rectalin–17 and has agreed to sell Rectalin–17 to persons in "desperate need" thereof.

With reference to the trademark application for Rectalin–17, Couture testified that it was filed in anticipation of the legalization of amygdalin products, and that he understood the statement therein to the effect that the Rectalin–17 was intended for use in interstate commerce to mean that it was being held for such use and not that it was being so used.

The defendant Couture further testified that as far as he is aware, no production of amygdalin by any of the defendants has occurred since July 29, 1977; however, experimentation with other materials such as apples, peaches, and barley has been conducted in an attempt to extract amygdalin. Finally, Couture testified that he has been involved in an attempt to incorporate a presently constituted partnership known as International American Corporation for the purpose of importing amygdalin from Taiwan and other places outside the United States to the Bahamas for the manufacture and sale of laetrile in the Bahamas. The five defendants in this action are the five

persons involved in establishing that corporation.

In relevant part, the defendant Birkenstock testified that he is a stockholder and director of U.S.P.I. and the owner of the factory building in Manitowoc, Wisconsin, in which laetrile was manufactured by U.S.P.I. prior to July 29, 1977. He stated that he was never involved in the day-to-day operation of the plant or the manufacture and sale of amygdalin; that since July 29, 1977, he is not aware that any amygdalin products have been produced by any of the defendants; that with reference to International American Corporation, he has never heard discussion of promoting or selling the laetrile to be produced in the Bahamas in the United States; and that he had never seen or heard of Rectalin–17 or Vitalin–17 until the court hearing on the order to show cause. Finally, Birkenstock testified that while he is currently the treasurer of U.S.P.I., the defendant Iwen has handled accounts for some time, and, in consequence, Birkenstock stated, he does not know if U.S.P.I. has generated any accounts receivable since July 29, 1977.

In relevant part, the defendant Pennings testified that he is a pharmacist and is a director and stockholder of U.S.P.I.; that he was formerly the president of U.S.P.I. but resigned because he wanted to experiment with developing liquid modalities of amygdalin, whereas U.S.P.I. was interested in solid forms; that he performed his experiments at the Pioneer Laboratories, which is owned by the Life Science Church of Damian and Cosmos, in Mosinee, Wisconsin; that in May and June 1977, the Pioneer Laboratories produced a lot of approximately 1,000 ampules of ⅓ ounce each of Rectalin–17, which is a solution of 80% amygdalin in 10 cc. of distilled water with a trace of chlorobutinol, intended for rectal administration. The defendant Pennings further testified that except for the original production lot of 1,000 ampules, Pioneer Laboratories has produced no more Rectalin–17; that of the 1,000 ampules, approximately 100 to 150 ampules remained in his possession or control on July 29, 1977; that he presently retains about 20 ampules at home; that he gave approximately 25 to 50 vials to Loyola University for experimentation; that he sent 50 to 60 vials to the defendant Couture in late December 1977 or early in January 1978; and that he sent 25 vials to a veterinary supply company, Nutricorp, in Los angeles. The defendant Pennings testified that he applied for a trademark for Rectalin–17 in order to protect his product in states where the sale of laetrile is permitted, and that he has sent some promotional materials around the country. (See Exhibit 15.) Pennings stated that while he maintains contact with Loyola University, he has not experimented with liquid forms of amygdalin himself since July 29, 1977.

The defendant Pennings further testified that Vitalin–17 is an oral tablet form of amygdalin and that he has approximately 120 tablets of Vitalin–17 at home which he purchased from Product Distributors Company in May or June 1977 for family use.

Finally, he testified that Vitacorp is a wholly-owned subsidiary of the Mosinee Research Corporation in which he is a stockholder, and that he does not know whether or not Vitacorp has shipped any amygdalin products since July 29, 1977.

In relevant part, the defendant Evers testified that he was employed by the Mosinee Research Corporation in 1975, and then became the plant manager at U.S.P.I. when it moved its plant location to Manitowoc, Wisconsin, in December 1976. He retains the position of plant manager, although he stated that he has not been paid since November 1977. Defendant Evers further testified that no amygdalin products have been manufactured from July 29, 1977, to the present at the U.S.P.I. plant, although he has been engaged at the plant since then in attempting to separate alcohol from approximately 300 barrels of apricot oil which is a byproduct of the laetrile production and which was left at the plant by the FDA inspectors on July 29, 1977. The oil is intended for use in cooking or as a base for a skin care lotion. The defendant Evers further testified that he has conducted some

experiments at the Manitowoc plant since July 29, 1977, on materials such as barley, alfalfa, millet, and cranberry in an attempt to extract amygdalin from them. Evers stated that in December 1977 and January 1978, there was one paid employee working at the plant, and that in February 1978, there were six employees at the plant, which was in operation 24 hours a day, who were paid at the rate of $3.75 to $5.00 per hour.

The defendant Evers further testified that on July 25 through July 28, 1977, the U.S.P.I. plant was in full operation; that he left the plant at approximately 5:00 P.M. on July 28; that when he returned to work the following morning, there was little or no amygdalin at the plant and that he did not know and did not ask how the amygdalin was removed, or by whom, or at whose order.

Finally, the defendant Evers testified that he has never been involved in any experimentation in, or production of, the product Rectalin–17.

In relevant part, the defendant Iwen testified that he was formerly the president of U.S.P.I. and is presently unemployed; that in anticipation of this Court's ruling on the plaintiff's motion for a preliminary injunction, he was to arrange for the disposal of all amygdalin remaining at the Manitowoc plant after July 25, 1977; that he told the defendant Evers to dispose of the material; and that he does not know and does not care what became of the amygdalin which remained at the plant on July 28, 1977, and which had disappeared prior to the arrival of the FDA inspectors on July 29, 1977. The defendant Iwen further testified that U.S.P.I. has at least one account receivable from a distributor in Texas for laetrile shipped prior to July 29, 1977; that it has some other accounts receivable from the sale of oil and alcohol; and that he is unaware of other accounts receivable which may exist.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Based on the testimony presented at the hearing held on the order to show cause on April 4 through April 6, 1978, and on the Court's observance of the demeanor of the witnesses at such hearing, the Court finds as matters of both fact and law:

1. The defendants, and each of them, have not complied with paragraph 4 of the decree of preliminary injunction issued on July 29, 1977, in that they have not submitted to this court an affidavit listing all distributors within defendants' knowledge of amygdalin produced or distributed by defendants as of July 29, 1977.

2. Defendants, and each of them, further have not complied with paragraph 4 of said decree of preliminary injunction in that they have not submitted an affidavit to this court listing all places where defendants have knowledge that any of their amygdalin or any component thereof was stored or held as of July 29, 1977.

3. Defendants Pennings and Couture further have not complied with paragraph 5 of said decree of preliminary injunction in that all existing amygdalin and amygdalin components in their possession or control from July 29, 1977, to the present have not been forfeited to the United States in the custody of the U. S. Marshal.

4. Defendant Pennings remains in noncompliance with paragraph 5 of said decree of preliminary injunction in that all existing amygdalin and amygdalin components in his possession or control from July 29, 1977, to the present have not been forfeited to the United States in the custody of the U. S. Marshal.

5. Amygdalin and amygdalin components which may still be in the possession or control of defendants in violation of paragraph 5 of said decree of preliminary injunction include: apricot kernels, both whole and ground; other substances such as grain and fruit kernels held for amygdalin extraction; processed and partly processed powder and liquid containing amygdalin; tablets containing amygdalin; liquid amygdalin for rectal use (known as Rectalin–17); amygdalin tablets known as Vitalin–17; other forms of amygdalin in experimental

stages; components necessary for amygdalin production; and labels and promotional material (including price lists, advertising, and correspondence with customers). For the purposes of this order, where the words "amygdalin" or "amygdalin components" appear, they shall include the items noted in this paragraph and, in addition, shall include all articles of food or drug known as laetrile, B–17, or Vitamin B–17. For purposes of this order, where the words "amygdalin" or "amygdalin components" appear, they shall not include the apricot oil which is a byproduct of the process of extraction of amygdalin from apricot kernels or the spent apricot kernels which remain after the process of extraction of amygdalin from apricot kernels is completed.

6. Amygdalin and amygdalin components have been held and promoted in connection with sale by the defendant Pennings in relation to interstate commerce since the issuance of said injunction on July 29, 1977, and Rectalin–17 has been shipped around the United States by the defendant Pennings since July 29, 1977. Given the history of all of these defendants and the facts shown, it is also, on this record, an impossible task to determine the true purpose of these shipments, and the Court expressly rejects any testimony that such shipments were for research purposes only.

7. While the defendants may not have maintained at any time, or may not have had available to them after July 29, 1977, complete lists of distributors of amygdalin produced or distributed by the defendants, the Court finds it unbelievable that none of the defendants, and in particular the defendants Iwen and Couture, were aware as of July 29, 1977, of the names of any such distributors. (See testimony of Couture re distribution of amygdalin products; testimony of Iwen re disposal of amygdalin on July 28, 1977.) Furthermore, the position maintained by the defendants at the hearing on April 4 to April 6, 1978, with respect to distributor lists, is inconsistent with their position maintained heretofore that to comply with that portion of paragraph 4 of the decree of preliminary injunction which re-

quires them to submit a list of distributors to the court would serve no purpose except to permit harassment of said distributors and of customers of the defendants by FDA agents and inspectors.

8. It is also not believable that as of July 29, 1977, none of the defendants, and in particular the defendants Iwen and Evers, were aware of the location of the amygdalin which was removed from the U.S. P.I. plant in Manitowoc, Wisconsin, on the evening of July 28, 1977, or the morning of July 29, 1977.

### ORDER

Based on the foregoing findings,

IT IS ORDERED AND ADJUDGED that:

1. The defendants, and each of them, are in civil contempt of paragraph 4 of the decree of preliminary injunction issued by this Court on July 29, 1977.

2. The defendant Pennings is further in contempt of paragraph 5 of said decree of preliminary injunction.

3. Defendants are each hereby ordered to submit an affidavit in the form required by paragraph 4 of the decree of preliminary injunction issued on July 29, 1977, within twenty days from the filing date of this order. Each of said affidavits shall be sworn and subscribed to by the individual defendant, with any attachments or explanations also so subscribed and sworn. Said affidavits shall specifically include all information requested in paragraph 4 of the decree of preliminary injunction issued on July 29, 1977. In order to insure compliance with paragraph 5 of the decree issued on July 29, 1977, said affidavits shall cover the time period from the inception of the defendant companies to the date of submission of the affidavits for lists of distributors. Said affidavits shall include all places where defendants have knowledge that amygdalin or amygdalin components in their possession or control are or were stored or

held shall include a certification that a good faith effort has been made to notify all agents and employees of defendants who have notice of the decree of injunction of the terms of this order, and that said agents and employees have been asked to notify the defendants of locations where such amygdalin might be found, and that any such locations identified are included in the affidavits.

4. Defendants are hereby prohibited from dealing with laetrile and amygdalin and all its components in any form in the United States of America, including all of Wisconsin. This order is intended as a complete prohibition on any activity by these defendants in the manufacturing, processing, packaging, distribution, labeling, or promoting in connection with the sale of amygdalin and its components, including experimentation and research with it.

5. All the amygdalin and amygdalin components, as defined in paragraph 5 of the findings of fact and conclusions of law herein, in the possession or control of defendants as of April 6, 1978, must be turned over to the U. S. Marshal within five days from the filing date of this order. Said amygdalin and amygdalin components specifically to be turned over include all vials or containers of Rectalin–17, Vitalin–17, and any amygdalin tablets or powder. All in-process amygdalin or amygdalin components, whether held for experimentation or any other purpose, must also be turned over by defendants to the U. S. Marshal within five days from the filing date of this order.

6. Should any of the individual defendants fail to comply with the submission of the affidavits referred to in paragraph 3 of the order herein within the time specified, he shall be fined at the rate of $500 per day until such time as compliance with that paragraph of this order is achieved.

7. Should the United States have reason to believe that any amygdalin or amygdalin component is in the possession or control of one or more defendants contrary to paragraph 5 of this order after the time specified therein, it shall file an affidavit with this court detailing the facts, upon the basis of which lack of compliance with paragraph 5 is asserted. This Court may issue such process as it sees fit, including warrants of seizure or other process, to seize any such articles held in violation of this order. If it is ultimately determined that the facts asserted in any affidavit filed by the United States are true, and that any one of the defendants has failed to comply with the terms of paragraph 5 of this order, then a fine of $500 per day shall, at the time of such determination, be assessed retroactively against each defendant for each day from the time specified in paragraph 5 of this order until the date the amygdalin or amygdalin components are in the custody of the U. S. Marshal. Said fine shall be assessed whether or not any process issues to seize any articles should the facts asserted by the United States be determined to be true and the defendant/defendants be determined to be, or to have been, in noncompliance with paragraph 5 of this order. The Court reserves the right to consider imprisonment in addition to the $500 per day fine to coerce compliance with paragraph 5 of this order should any of the facts indicate a flagrant or willful disregard of this Court's order.

8. The United States shall file a bill of costs with the clerk of this court detailing costs and other litigation expenses, including service fees, in bringing this civil contempt action, said costs and litigation expenses to be taxed to defendants when finally ascertained. However, said bill of costs shall not include any costs or other expenses incurred by the United States in connection with the illegal search conducted at the U.S.P.I. plant in Manitowoc, Wisconsin, on February 10, 1978, nor shall it include any costs or other expenses incurred by the United States in connection with the witnesses presented on behalf of the United States at the hearing held in this matter on April 4 to April 6, 1978.

9. A warrant of seizure and monition is hereby authorized for the premises of the U.S.P.I. plant at 1423 Marshall Street, Manitowoc, Wisconsin, to be served by the U. S. Marshal within five days from the filing

date of this order. The items to be seized are amygdalin and amygdalin components as defined in paragraph 4 of this order.

10. In order to insure compliance with the terms of this order and with paragraphs 4 and 5 of the decree of preliminary injunction issued on July 29, 1977, the defendants are prohibited from engaging in the manufacturing, processing, packaging, distribution, labeling, or promoting in connection with the sale of apricot kernels or the by-products of amygdalin production, including apricot oil and spent apricot kernels. However, the United States is ordered to designate as its agent, for purposes of this and the following paragraph, an employee of the Federal Food and Drug Administration who is located in Milwaukee, Wisconsin, and the defendants may apply to said agent for permission to engage in any of the activities specified above in this paragraph. Permission shall be freely granted on condition that the defendants permit said agent, at Government expense, to observe any such activity which is undertaken by the defendants.

11. In order to insure compliance with the terms of this order and with paragraph 5 of the decree of preliminary injunction issued on July 29, 1977, and in view of the testimony at the hearing held on April 4 to April 6, 1978, to the effect that Mosinee Research Corporation and U.S.P.I. are virtually out of business.

IT IS ORDERED that before any activity of any kind is undertaken by either of these defendants, and before any activity of any kind, except routine maintenance, is undertaken at the facility located at 1423 Marshall Street, Manitowoc, Wisconsin, the defendants, or whichever of them desires to undertake such activity, shall apply to the agent designated by the United States, pursuant to the terms of paragraph 10 above, for permission to undertake any such activity. Such permission shall be freely granted on condition that the defendant or defendants permit said agent, at Government expense, to observe such activity.

12. This Court retains jurisdiction to enforce the provisions of this order and of its decree of preliminary injunction issued on July 29, 1977.